**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Julie Thrash, | ) CIV 09-1304-PHX-MHB |
| Plaintiff, | ) |
| vs. | ) **ORDER** |
| Michael J. Astrue, Commissioner of Social Security, | ) |
| Defendant. | ) |

Pending before the Court is Plaintiff Julie Thrash's appeal from the Social Security Administration's final decision to deny her claim for Supplemental Security Income. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.

**I. PROCEDURAL HISTORY**

On November 30, 2006, Plaintiff filed an application for Supplemental Security Income pursuant to Title XVI of the Social Security Act. (Transcript of Administrative Record ("Tr.") at 95-101, 30.) Her application was denied both initially and on reconsideration. (Tr. at 61-64, 57.) Following a timely request from Plaintiff, a hearing was held before Administrative Law Judge ("ALJ") Joan G. Knight, on July 28, 2008. (Tr. at 28-54.) At the hearing, Plaintiff amended the alleged onset date to November 30, 2006. (Tr. at 31.) After taking the matter under advisement, the ALJ denied Plaintiff's claim on September 24, 2008, finding Plaintiff not disabled. (Tr. at 14-24.) Plaintiff subsequently requested review of the ALJ's decision by the Appeals Council. (Tr. at 8-9.) On April 22,

2009, the Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. at 1-4.)

Plaintiff then commenced the instant action for judicial review pursuant to 42 U.S.C. § 1383(c)(3).

## II. STANDARD OF REVIEW

The Court must affirm the ALJ's findings if the findings are supported by substantial evidence and are free from reversible legal error. See Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see Reddick, 157 F.3d at 720.

In determining whether substantial evidence supports a decision, the Court considers the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion. See Reddick, 157 F.3d at 720. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing the [Commissioner's] conclusion, the court may not substitute its judgment for that of the [Commissioner]." Reddick, 157 F.3d at 720-21.

## III. THE ALJ'S FINDINGS

In order to be eligible for disability or social security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An ALJ determines a claimant's eligibility for benefits by following a five-step sequential evaluation:

(1) determine whether the applicant is engaged in "substantial gainful activity";

- 2 -

(2) determine whether the applicant has a medically severe impairment or combination of impairments;

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520). At the fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can perform other substantial gainful work. See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

The ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. (Tr. at 14.) The ALJ determined that Plaintiff had the following impairments: mood disorder not otherwise specified. (Tr. at 15.) She considered this impairment severe, but not severe enough to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Commissioner's regulations. (Tr. at 17.) After careful consideration of the entire record, the ALJ found that Plaintiff retained the residual functional capacity to perform work at all exertional levels, but – from a mental perspective – she was limited to simple, unskilled work.[1] (Tr. at 18, 20.) Based on this residual functional capacity, the ALJ determined Plaintiff was not disabled both because she could perform her past relevant work as a health care provider and because she could perform other work existing in significant numbers in the national economy based on vocational expert testimony. (Tr. at 22-23.)

---

[1] "Residual functional capacity" is defined as the most a claimant can do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks. See 20 C.F.R. § 404.1545(a).

- 3 -

## IV. DISCUSSION

In her brief, Plaintiff contends that the ALJ erred by: (A) rejecting the assessment of the examining psychologist, Elliott Salk, Ph.D., when the vocational expert testified the limitations assessed by Dr. Salk precluded the ability to work; (B) rejecting Plaintiff's symptom testimony in the absence of clear and convincing reasons for doing so; (C) determining Plaintiff's residual functional capacity as the ability to perform "simple unskilled work" without undertaking the function-by-function mental residual functional capacity assessment required by Social Security Ruling 96-8p; and (D) failing to sustain the burden of establishing other jobs Plaintiff could perform because the ALJ relied on vocational expert testimony that differed from job data in the Dictionary of Occupational Titles ("DOT") without obtaining an explanation for the discrepancy as required by Social Security Ruling 00-4p. Plaintiff requests that the Court remand for determination of disability benefits.

### A.   Rejection of Examining Psychologist's Opinion

Plaintiff first argues that the ALJ erred by rejecting the assessment of the examining psychologist, Elliott Salk, Ph.D., when the vocational expert testified the limitations assessed by Dr. Salk precluded the ability to work.

An ALJ may reject an examining or treating physician's opinion when it is inconsistent with the opinions of other treating or examining physicians if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (quoting Magallanes, 881 F.2d at 751). When the medical opinion of an examining or treating physician is uncontroverted, however, the ALJ must give "clear and convincing reasons" for rejecting it. See Thomas, 278 F.3d at 957; see also Lester v. Chater, 81 F.3d 821, 830-32 (9th Cir. 1995).

A nonexamining physician is one who neither examines nor treats the claimant. See Lester, 81 F.3d at 830. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." Id. at 831. When a nonexamining physician's opinion

- 4 -

1  contradicts an examining physician's opinion and the ALJ gives greater weight to the
2  nonexamining physician's opinion, the ALJ must articulate his reasons for doing so. See,
3  e.g., Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600-01 (9th Cir. 1999). A
4  nonexamining physician's opinion can constitute substantial evidence if it is supported by
5  other evidence in the record. See id. at 600.

6  In July of 2007, Dr. Salk performed a psychological consultative examination at the
7  request of the state agency. (Tr. at 300-05.) At the time, Plaintiff was not taking any
8  medications because she did not have insurance. (Tr. at 301.) She reported that she was
9  always depressed and had daily panic attacks – which lasted about four to five minutes – for
10 the past ten years. (Tr. at 301.)

11 She reported the following daily activities. She woke up around 8:30 a.m., washed
12 her face, brushed her teeth, and made her bed. (Tr. at 302.) She ate breakfast, got her
13 children ready for school, did laundry, washed dishes, vacuumed, dusted, and cleaned the
14 kitchen and bathroom. (Tr. at 302.) She prepared meals and went grocery shopping – once
15 a month for a large number of items and every other day for a smaller number of items. (Tr.
16 at 302.)

17 On exam, her hair was neatly groomed, and her grooming and clothing were clean.
18 (Tr. at 302.) She was anxious, irritable, and manipulative. (Tr. at 304.) Her vocabulary was
19 poor, but adequate for communication. (Tr. at 304.) Dr. Salk opined that Plaintiff appeared
20 "a little bit depressed" and anxious. (Tr. at 304-05.) Her attention span was poor and her
21 associations were scattered, possibly due to her anxiety. (Tr. at 305.) Her pace was normal,
22 her intellectual functioning was estimated to be borderline, and her judgment was "probably
23 somewhat poor at times." (Tr. at 305.) He diagnosed Plaintiff with mood disorder and
24 probable personality disorder. (Tr. at 305.)

25 Dr. Salk also completed a medical source statement. (Tr. at 306-10.) He opined that
26 Plaintiff was moderately limited in her ability to do the following: understand, remember,
27 and carry out detailed instructions; maintain attention and concentration for extended periods;
28 perform activities within a schedule, maintain regular attendance, and be punctual within

1  customary tolerances; sustain an ordinary routine without special supervision; work in
2  coordination with or proximity to others without being distracted; complete a normal
3  workday or workweek without interruptions from psychologically based symptoms and to
4  perform at a consistent pace without an unreasonable number and length of rest periods;
5  interact appropriately with the general public; accept instructions and respond appropriately
6  to criticism from supervisors; get along with coworkers or peers without distracting them or
7  exhibiting behavior extremes; and respond appropriately to changes in work settings.  (Tr.
8  at 306-09.)  Dr. Salk, otherwise, opined that Plaintiff was, at most, "not significantly limited"
9  and failed to indicate what Plaintiff is capable of doing despite her limitations.  (Tr. at 306-
10 10.)

11         Also in July, after Dr. Salk examined Plaintiff, David Yandell, Ph.D., a state agency
12 psychologist, completed a psychiatric review technique form and a mental residual functional
13 capacity assessment.  (Tr. at 281-98.)  Dr. Yandell's opinion mirrors that of Dr. Salk.  (Tr.
14 at 295-97.)  Significantly, Dr. Yandell noted that the "MRFC [mental residual functional
15 capacity assessment] follow[ed] closely the MSS [medical source statement] ratings provided
16 by Dr. Salk." (Tr. at 297.)  In fact, the "moderate" limitations found in Dr. Yandell's
17 assessment were entirely identical with Dr. Salk's assessment.  (Tr. at 306-09, 295-97.)
18 Unlike Dr. Salk, however, Dr. Yandell did indicate what Plaintiff is able to do despite her
19 limitations concluding that Plaintiff is "capable of performing simple, unskilled job tasks on
20 a sustained basis."  (Tr. at 297.)

21         Later, at the administrative hearing held on July 28, 2008, the vocational expert
22 ("VE"), Thomas Mitchell, Ph.D., classified Plaintiff's past relevant work and then responded
23 to a hypothetical question from the ALJ that assumed a "person were restricted, but could
24 understand, remember, and carry out simple instructions.  And is capable of performing
25 simple, unskilled job tasks on a sustained basis."  (Tr. at 51.)  With that assumption, the VE
26 identified Plaintiff's past relevant work as a care provider and also "simple unskilled work"
27 as a cashier, assembler, and security positions.  (Tr. at 51-52.)
28

1  Plaintiff's counsel then stated: "Please assume an individual with the Claimant's age,
2  education, and work experience. But assume they were limited as identified by Dr. Salk."
3  (Tr. at 51-52.) The VE stated, "[t]he combination of ability to maintain concentration for
4  extended periods, ability to perform activities within [a] schedule, maintain regular
5  attendance and be punctual. Ability to sustain a normal routine without special supervision.
6  Ability to work in coordination or proximity of others without being distracted by them.
7  Ability to complete a normal workday or work week without interruptions from
8  psychologically based symptoms. All being limited, I feel, in combination would not allow
9  a person to be able to sustain employment." (Tr. at 53.)

10  In her assessment of the medical evidence at issue, the ALJ stated, in pertinent part:

> However, the undersigned is not fully persuaded by the opinion of Dr. Salk, the psychological consultative evaluator (Exhibit 18F, pages 7-12). His opinion that she would be moderately limited in her ability to understand, remember and carry out detailed instructions was supported fully by her performance on the consultative examination, her estimated intellectual functioning in the borderline range and her limited schooling. Likewise, his opinion that she would be moderately limited in her ability to maintain attention and concentration for extended periods is consistent with her performance on the consultative evaluation. However, there is no support for his opinion that she would be moderately limited in her ability to perform activities within a schedule, maintain regular attendance and being punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; perform a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticisms from supervisors; get along with coworkers or pickers [as original] without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. On his medical source statement, Dr. Salk did not indicate what findings supported these conclusions. Further, these extreme restrictions are not supported by his evaluation of the claimant. As well, they are not supported by the record as a whole. The claimant is able to care for her children and see that they go to school. She can keep up with her housework and meal preparations household bills [as original]. There is no indication that she could not sustain work activity.

25  (Tr. at 21-22.)

26  The ALJ continued stating: "the undersigned gives substantial weight to the State
27  Agency medical consultants who reviewed the claimant's file and determined the claimant's

mental residual functional capacity at Exhibit 16F [Mental Residual Functional Capacity Assessment completed by Dr. Yandell]. This medical opinion is compelling as it is supported by the great weight of the evidence of record." (Tr. at 22.)

Citing Stubbs-Danielson v. Astrue, 539 F3d 1169 (9th Cir. 2008), Defendant argues that the ALJ did not reject Dr. Salk's opinion. Defendant states that the ALJ simply adopted Dr. Yandell's opinion, who assessed the same specific limitations as Dr. Salk, but opined to "concrete restrictions" – the limitation to simple, unskilled work. The Court agrees.

In Stubbs-Danielson, an examining physician opined that the claimant had several, specific mental limitations. See id. at 1171, 1173-74. A state agency psychologist reviewed the examining physician's report, assessed several moderate mental limitations, and ultimately concluded that the claimant was capable of carrying out simple tasks. See id. The ALJ then found that the claimant retained the residual functional capacity to "perform simple, routine, repetitive sedentary work, requiring no interaction with the public." Id. at 1171. On appeal, the claimant argued that the ALJ "improperly rejected the opinions of [her] treating and examining doctors." Id. at 1173. The Ninth Circuit disagreed finding: "[the examining physician] did not assess whether [the claimant] could perform unskilled work on a sustained basis. [The state agency psychologist's] report did." Id. The court continued stating, "[t]he ALJ translated [the claimant's] condition ... into the only concrete restrictions available to him – [the state agency psychologist's] recommended restriction to 'simple tasks.' This does not, as [the claimant] contends, constitute a rejection of [the examining physician's] opinion." Id. at 1174.

Similar to Stubbs-Danielson, both Dr. Salk and Dr. Yandell assessed the same, specific mental limitations. Dr. Yandell, however, opined to the only "concrete restrictions" available – the limitation to simple, unskilled work. The ALJ's adoption of Dr. Yandell's opinion "does not, as [Plaintiff] contends, constitute a rejection of [Dr. Salk's] opinion." Id. Dr. Yandell's opinion constitutes substantial evidence to support the ALJ's decision because his opinion is consistent with other evidence in the record. See Saelee v. Chater, 94 F.3d

1    520, 522 (9th Cir. 1996) ("The findings of a nontreating, nonexamining physician can amount
2    to substantial evidence so long as other evidence in the record supports those findings.").

3          To the extent Plaintiff asserts that the ALJ erred because the VE testified that a
4    hypothetical person with the specific limitations identified by Dr. Salk could not sustain
5    work, the Court is not persuaded. This argument was also rejected by the Stubbs-Danielson
6    court. There, a vocational expert testified that a person with anything more than a mild
7    limitation with respect to pace would be precluded from employment; the examining
8    physician opined that Plaintiff was moderately limited in her ability to perform at a consistent
9    pace. See Stubbs-Danielson, 539 F.3d at 1173-74. "[T]he ALJ refused to lend any weight
10   to the assessment because it did not address [the claimant's] RFC and did not appear to be
11   based on her individual record as a whole. This represents the type of credibility
12   determination charged to the ALJ which we may not disturb where, as here, the evidence
13   reasonably supports the ALJ's decision." Id. at 1174 (citing Batson v. Comm'r of Soc. Sec.
14   Admin., 359 F.3d 1190, 1195-96 (9th Cir. 2004)).

15         Thus, the Court finds that the ALJ's assessment of the medical evidence at issue is
16   supported by substantial evidence.

17   **B.     Rejection of Plaintiff's Symptom Testimony**

18         Next, Plaintiff alleges that the ALJ erred by rejecting Plaintiff's symptom testimony
19   in the absence of clear and convincing reasons for doing so.

20         In Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986), the Ninth Circuit established two
21   requirements for a claimant to present credible symptom testimony: The claimant must
22   produce objective medical evidence of an impairment or impairments, and he must show the
23   impairment or combination of impairments could reasonably be expected to produce some
24   degree of symptom. See id. at 1407. The claimant, however, need not produce objective
25   medical evidence of the actual symptoms or their severity. See Smolen v. Chater, 80 F.3d
26   1273, 1284 (9th Cir. 1996).

27         If the claimant satisfies the above test and there is not any affirmative evidence of
28   malingering, the ALJ can reject the claimant's pain testimony only if he provides clear and

1  convincing reasons for doing so. See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007)
2  (citing Lester, 81 F.3d at 834). General assertions that the claimant's testimony is not
3  credible are insufficient. See id. The ALJ must identify "what testimony is not credible and
4  what evidence undermines the claimant's complaints." Id. (quoting Lester, 81 F.3d at 834).

5        In weighing a claimant's credibility, the ALJ may consider many factors, including,
6  "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,
7  prior inconsistent statements concerning the symptoms, and other testimony by the claimant
8  that appears less than candid; (2) unexplained or inadequately explained failure to seek
9  treatment or to follow a prescribed course of treatment; and (3) the claimant's daily
10 activities." Smolen, 80 F.3d at 1284; see Orn v. Astrue, 495 F.3d 625, 637-39 (9th Cir. 2007).
11 The ALJ also considers "the claimant's work record and observations of treating and
12 examining physicians and other third parties regarding, among other matters, the nature,
13 onset, duration, and frequency of the claimant's symptom; precipitating and aggravating
14 factors; functional restrictions caused by the symptoms; and the claimant's daily activities."
15 Smolen, 80 F.3d at 1284 (citation omitted).

16       In her decision, the ALJ first referenced the fact that Plaintiff received only sporadic
17 mental health treatment and had not been psychiatrically hospitalized. (Tr. at 18.) See
18 Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (*en banc*) ("unexplained, or
19 inadequately explained, failure to seek treatment or follow a prescribed course of treatment"
20 is a relevant factor in assessing credibility of pain testimony (internal quotation marks
21 omitted)). But cf. Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) (it is a questionable
22 practice to chastise a mentally impaired claimant for the exercise of poor judgment in seeking
23 rehabilitation).

24       The ALJ also discounted Plaintiff's testimony because she was not taking any
25 psychotropic medications, which she had previously reported helped her mood. (Tr. at 18-
26 19.) A claimant's failure to take prescribed psychotropic medications, despite the fact that
27 she reported that they helped her mood, is a clear and convincing reason for discounting
28 Plaintiff's testimony of disabling mental impairments. See Meanal v. Apfel, 172 F.3d 1111,

1114 (9th Cir. 1999) (an ALJ may consider a claimant's failure to follow treatment advice as a factor in assessing claimant's credibility); Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1997) (ALJ properly concluded claimant's mental impairment was not severe where he was not undergoing regular mental-health treatment or regularly taking psychiatric medications, and activities were not restricted by emotional causes); Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996) (an impairment that could reasonably be alleviated by medication or treatment could not serve as a basis for a finding of disability). In the Fall of 2007, Plaintiff had been prescribed Depakote at New Arizona Family; she reported that the medications helped with her mood swings.[2] (Tr. at 19, 234.) In December of 2007, however, Plaintiff was terminated from New Arizona Family for lack of participation after her medications ran out. (Tr. at 19, 232.) Then, in April of 2008, Plaintiff returned to New Arizona Family because she wanted "to get back on medications because they helped her before in dealing with her life." (Tr. at 312, 313.)

Additionally, even without psychotropic medications, Plaintiff's activities of daily living were largely unimpaired. (Tr. at 19.) Specifically, Plaintiff reported to Dr. Salk that she maintained her hygiene, cleaned her house, got her children ready for school, prepared meals, and went grocery shopping – once a month for a large number of items and every other day for a smaller number of items. (Tr. at 20, 302.) These activities are inconsistent with her testimony that she has panic attacks every other day. (Tr. at 38, 47.) Where a claimant's activities of daily living are inconsistent with her alleged impairments, an ALJ may reject her testimony. Cf. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (finding that the plaintiff's active lifestyle, which included cleaning, cooking, walking her dogs, and driving to appointments, did not support her allegations of disabling respiratory illness). Further, the Ninth Circuit has held that the daily activities of cooking,

---

[2] At the administrative hearing, Plaintiff reported that the Depakote did not help. (Tr. at 36-37.) See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider ... ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid ... .").

- 11 -

1  house cleaning, doing laundry, and helping to manage finances supports a finding that the
2  individual may be capable of performing "the basic demands of competitive, remunerative,
3  unskilled work on a sustained basis." Stubbs-Danielson, 539 F.3d at 1175.

4  The ALJ similarly noted that Plaintiff's testimony at the hearing was inconsistent with
5  the activities she reported to Dr. Salk. (Tr. at 20.) Inconsistent with Plaintiff's reports to Dr.
6  Salk (Tr. at 302), at the administrative hearing, Plaintiff testified that during the summer, "I
7  pretty much don't do anything. You know, lay around, watch TV, do a few house chores if
8  I can." (Tr. at 47.) During the school year, she testified that she made sure her children were
9  awake "and g[o]t out the door to school. That's about it." (Tr. at 47.) An ALJ may consider
10 ordinary techniques of credibility evaluation when deciding what weight to assign a
11 claimant's testimony; this includes prior inconsistent statements regarding symptoms and
12 limitations. See Tommasetti, 533 F.3d at 1039.

13 Finally, the ALJ found that Plaintiff had a poor earnings record – reporting low or no
14 earnings for many years. (Tr. at 20.) See Thomas, 278 F.3d at 959 (9th Cir. 2002) (affirming
15 the ALJ's credibility analysis which was based, in part, on the plaintiff's "extremely poor
16 work history"). As demonstrated by her earnings records, Plaintiff had years of
17 unemployment between jobs even before she claimed disability in 2006. (Tr. at 102-03.)
18 The fact that Plaintiff "has shown little propensity to work in her lifetime ... negatively
19 affected her credibility regarding her inability to work." Thomas, 278 F.3d at 959.

20 In summary, the ALJ provided a sufficient basis to find Plaintiff's allegations not
21 entirely credible. While perhaps the individual factors, viewed in isolation, are not sufficient
22 to uphold the ALJ's decision to discredit Plaintiff's allegations, each factor is relevant to the
23 ALJ's overall analysis, and it was the cumulative effect of all the factors that led to the ALJ's
24 decision. The Court concludes that the ALJ has supported her decision to discredit Plaintiff's
25 allegations with specific, clear and convincing reasons and, therefore, the Court finds no
26 error.

27 \\\
28 \\\

1  **C.    The ALJ's Mental Residual Functional Capacity Assessment**

2       Third, Plaintiff argues that the ALJ erred by determining Plaintiff's residual functional
3  capacity as the ability to perform "simple unskilled work" without undertaking the function-
4  by-function mental residual functional capacity assessment required by Social Security
5  Ruling 96-8p.

6       The ALJ, after consideration of the entire record, concluded that Plaintiff retained the
7  residual functional capacity to work at any exertional level, but was limited to simple
8  unskilled work. (Tr. at 20, 23.)

9       In deciding Plaintiff's mental residual functional capacity, the ALJ first addressed
10 Plaintiff's subjective allegations. (Tr. at 18.) Initially, and as noted previously, the ALJ
11 determined that Plaintiff's subjective allegations were not fully supported by the medical
12 record. (Tr. at 18.) The ALJ found that Plaintiff had no psychiatric hospitalizations and only
13 sporadic mental health treatment. (Tr. at 18.) Citing to Dr. Salk's evaluation, the ALJ
14 determined that, even when not using any psychotropic medication, Plaintiff's activities of
15 daily living were largely unimpaired. (Tr. at 19-20.) The ALJ also documented Plaintiff's
16 brief treatment history at New Arizona Family. (Tr. at 19.) The record cited by the ALJ
17 states that Plaintiff "attended a general mental health group for a short time, and completed
18 a psych eval. [Plaintiff] received medication, however her prescriptions ran out at the first
19 of December, 2007. Attempted contact with [Plaintiff] by phone as well. Letter were to no
20 avail and she is being closed with [New Family] due to lack of participation." (Tr. at 18,
21 231.) The ALJ concluded that Plaintiff's lack of treatment failed to support her assertions
22 regarding the severity of her impairment and her ability to engage in work activity. (Tr. at
23 19.)

24      Further, regarding Plaintiff's credibility, among other things, the ALJ particularly
25 noted the inconsistencies between Plaintiff's activities of daily living and her testimony at
26 the hearing. (Tr. at 20.) For example, the ALJ found that Plaintiff lives with her three
27 youngest children; her daily activities included caring for her own hygiene, bathing, and
28 grooming; she eats breakfast and gets her children ready for school; she does about four loads

- 13 -

1   of laundry per week; she washes dishes, vacuums, dusts, and cleans the kitchen and
2   bathroom; she prepares dinner and makes sure that her children have clean, matching
3   clothing for the next day; she goes grocery shopping for a large number of items about one
4   time per month and she goes about every other day for a small number of items; she prepares
5   seven to eight meals per day; and she visits her mother every other day.  (Tr. at 20.)

6   In determining Plaintiff's mental residual functional capacity assessment, the ALJ also
7   considered the opinions of Dr. Salk, who performed a consultative psychological evaluation,
8   and Dr. Yandell, a state agency psychologist, who completed a psychiatric review technique
9   form and a mental residual functional capacity assessment.  (Tr. at 19-22.)

10   Dr. Salk opined that Plaintiff appeared a little bit depressed as evidenced by
11   tearfulness on occasion.  (Tr. at 19.)  She also appeared anxious as evidenced by intense
12   affect and irritability.  (Tr. at 19.)  Her attention span was very poor and her associations
13   appeared scattered, which Dr. Salk stated was possibly a manifestation of her anxiety.  (Tr.
14   at 19.)  Her persistence was somewhat poor and her pace appeared within normal limits
15   although she was impulsive.  (Tr. at 19.)  Dr. Salk characterized Plaintiff as a bit
16   manipulative especially at the beginning of the evaluation when she almost immediately
17   criticized him.  (Tr. at 19.)  Dr. Salk found that Plaintiff did not appear delusional, paranoid,
18   manic, or psychotic.  (Tr. at 19.)  Her intellectual functioning was estimated to fall around
19   the Borderline range based on her poor use of language and her memory skills were
20   consistent with her estimated level of intelligence.  (Tr. at 19.)  Dr. Salk also found that
21   Plaintiff's judgment was probably somewhat poor at times.  (Tr. at 19.)  Dr. Salk diagnosed
22   Plaintiff with a mood disorder not otherwise specified and a probable personalty disorder not
23   otherwise specified.  (Tr. at 19.)

24   As set forth by the ALJ, in his medical source statement, Dr. Salk found that Plaintiff
25   would have no limitations or not significant limitations in various areas of occupational
26   adjustment, but would have "moderate" limitations ("fair/limited but not precluded") in the
27   following areas (Tr. at 21):

28       – ability to understand and remember detailed instructions;

- 14 -

– ability to carry out detailed instructions;

– ability to maintain attention and concentration for extended periods;

– ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

– ability to sustain an ordinary routine without special supervision;

– ability to work in coordination with or proximity to others without being distracted by them;

– ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

– ability to interact appropriately with the general public;

– ability to accept instructions and respond appropriately to criticism from supervisors;

– ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

– ability to respond appropriately to changes in the work setting.

The ALJ also considered the opinion of Dr. Yandell. (Tr. at 22.) Dr. Yandell stated that Plaintiff's mental residual functional capacity assessment follows closely with Dr. Salk's medical source statement. (Tr. at 297.) Specifically, the "moderate" limitations found by Dr. Yandell were identical with Dr. Salk's assessment. (Tr. at 295-97.)

Having analyzed Plaintiff's medical record and history of mental health treatment, evidence of Plaintiff's daily activities, and the medical assessments of Drs. Salk and Yandell, the ALJ found that Plaintiff's mood disorder not otherwise specified causes only mild restrictions in her activities of daily living and social functioning, and moderate limitations in her concentration, persistence, and pace. (Tr. at 20.) Accordingly, the ALJ concluded that Plaintiff retains the residual functional capacity to work at any exertional level, but is limited to simple unskilled work. (Tr. at 20.)

The residual functional capacity assessment must be based on all of the relevant evidence in the record, including the effects of symptoms that are reasonably attributed to a medically determinable impairment. See SSR 96-8p. In addition, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are

1 not 'severe,'" because such limitations may be outcome determinative when considered in
2 conjunction with limitations or restrictions resulting from other impairments. Id. SSR 96-8p
3 provides a blueprint for what an residual functional capacity assessment must contain in all
4 cases in which symptoms are alleged: (1) a thorough discussion and analysis of the objective
5 medical and other evidence, including the individual's complaints of pain and other symptoms
6 and the ALJ's personal observations, if appropriate; (2) a resolution of any inconsistencies in
7 the evidence as a whole; and (3) a logical explanation of the effects of symptoms, including
8 pain, on the individual's ability to work.

9 Contrary to Plaintiff's assertion that the ALJ erred in her mental residual functional
10 capacity assessment, the Court finds that the ALJ provided: (1) a substantial and detailed
11 discussion of the objective medical and other evidence; (2) a resolution of possible
12 inconsistencies in the evidence; and (3) a logical explanation of the effects of symptoms on
13 the individual's ability to work. The ALJ properly determined Plaintiff's residual functional
14 capacity in relation to her limitations. (Tr. at 18-22.)

15 The Court, therefore, finds that the ALJ provided an adequate assessment of Plaintiff's
16 limitations and a narrative discussion of how the medical evidence and other evidence of
17 record supported her assessment of Plaintiff's residual functional capacity. The ALJ's
18 residual functional capacity finding is supported by substantial evidence.

### D. Conflict Between the DOT and the VE's Testimony

20 Lastly, Plaintiff argues that the ALJ erred by not resolving an alleged conflict between
21 the DOT and the VE's testimony. Specifically, she argues that the limitation to simple work
22 precluded jobs with an SVP of 2, which she argues "requires the ability to carry out 'detailed'
23 instructions."

24 SSR 00-4p requires an ALJ to "[a]sk the VE or VS if the evidence he or she has
25 provided conflicts with information provided in the DOT; and [i]f the VE's or VS's evidence
26 appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the
27 apparent conflict." 2000 WL 1898704, at *4.

28

Here, the VE identified four jobs: care giver, reasoning level three and SVP 3; cashier, reasoning level three and SVP 2; assembler, reasoning level two and SVP 2; and guard, reasoning level three and SVP 3. (Tr. at 51-52.) Since the DOT classifies both care provider, DOT No. 354.377-014, and guard, DOT No. 372.667-030, as SVP 3 jobs, which are semi-skilled, Defendant concedes that there is an unresolved conflict between the VE's testimony and the DOT because the VE testified that these particular jobs were unskilled. (Tr. at 52.) Additionally, although Plaintiff fails to cite any authority holding that a reasoning level of three necessarily exceeds the limitation to simple work, the Court finds an unresolved conflict between the VE's testimony and the DOT regarding the VE's identification of cashier jobs, DOT No. 209.567-014. The Court, however, finds no conflict between the VE's testimony and the DOT regarding the VE's identification of assembler jobs, DOT No. 654.687-014.

Initially, the Court notes that specific vocational preparation SVP (specific vocational preparation) and reasoning level are two separate and distinct vocational considerations.

> A job's SVP is focused on "the amount of lapsed time" it takes for a typical worker to learn the job's duties. A job's reasoning level, by contrast, gauges the minimal ability a worker needs to complete the job's tasks themselves. ... "SVP ratings speak to the issue of the level of vocational preparation necessary to perform the job, not directly to the issue of a job's simplicity, which appears to be more squarely addressed by the GED [reasoning level] ratings."

Meissl v. Barnhart, 403 F.Supp.2d 981, 983 (C.D. Cal. 2005) (internal citation omitted).

To the extent Plaintiff argues that the VE's testimony conflicts with the DOT because assembler is a SVP 2 job, Plaintiff's argument fails. Plaintiff retained the residual functional capacity to perform unskilled work, which the Commissioner has defined to correspond to SVP 2 jobs. See SSR 00-4p, 2000 WL 1898704, at *3 (stating that unskilled work corresponds to an SVP of 1 or 2). Thus, by definition, Plaintiff can perform the SVP 2 job of an assembler.

Likewise, to the extent the Plaintiff argues that the VE's testimony – that she is capable of working as an assembler – conflicts with the DOT because that job has a reasoning level of two – which Plaintiff argues precludes simple work – her argument fails as well. Several courts have found level two reasoning to be consistent with the ability to do simple, routine

1  and/or repetitive work tasks.  See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir.
2  2005) (level two reasoning more consistent with limitation to simple, routine work tasks);
3  Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005) (limitation to simple,
4  repetitive tasks closer to level two reasoning); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51
5  (D.Minn. 2001) (level two reasoning did not conflict with limitation to work involving simple,
6  routine, repetitive, concrete, and tangible tasks).

7      Thus, the Court finds no conflict between the VE's testimony and the DOT regarding
8  the VE's identification of assembler jobs having a reasoning level of two and a SVP of 2.

9      The VE testified that there were 2,000 assembler jobs in Arizona and 116,000 jobs
10  nationally. (Tr. at 52.)  This constitutes a significant number of jobs.  See Barker v. Sec'y of
11  Health & Human Servs., 882 F.2d 1474, 1478-80 (9th Cir. 1989) (concluding that 1,200 jobs
12  was a significant number); Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988) (as few as
13  500 jobs in the region were a significant number); Hall v. Bowen, 837 F.2d 272, 275 (6th Cir.
14  1988) (1,350 jobs in the local economy constituted a significant number).  Therefore, based
15  on assembler jobs alone, the ALJ carried her step-five burden of demonstrating that Plaintiff
16  can perform a significant number of jobs in the national economy.

17  **V.  CONCLUSION**

18      The Court finds that the ALJ properly concluded that Plaintiff is not disabled.  Based
19  upon the foregoing discussion,

20      **IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social
21  Security be affirmed;

22      **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment
23  accordingly.  The judgment will serve as the mandate of this Court.

24      DATED this 21st day of September, 2010.

25

26  *[signature: Michelle H. Burns]*

27  Michelle H. Burns
    United States Magistrate Judge

28